IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

CHARLA K. ROMANS,                        )
                                         )
        Plaintiff,                      )
                                         )      CV 06-1331-AA
    v.                                 )
                                         )
COMMISSIONER OF SOCIAL SECURITY,         )      OPINION AND ORDER
                                         )
        Defendant.                      )
                                         )

DAVID B. LOWRY
9900 SW Greenberg Road
Columbia Business Center, Suite 235
Portland, OR 97223
    Attorney for Plaintiff

KARIN J. IMMERGUT
United States Attorney
NEIL J. EVANS
Assistant United States Attorney
1000 SW Third Avenue, Ste 600
Portland Oregon 97204

1 - OPINION AND ORDER

STEPHANIE R. MARTZ
Social Security Administration
701 5th Avenue, Ste 2900 M/S 901
Seattle Washington 98104
    Attorneys for Defendant

AIKEN, District Judge:

Plaintiff Charla Romans challenges the Commissioner's decision denying her application for disability insurance benefits under Title II of the Social Security Act. The court has jurisdiction under 42 U.S.C. § 405(g). For the reasons that follow, the Commissioner's decision must be reversed and remanded for further proceedings.

Romans was born February 10, 1949. She completed high school and worked as a bookkeeper, data entry clerk, retail sales clerk, product demonstrator, fast food worker and non-medical care provider. Adjudication on an earlier claim established that Romans was not disabled during the period from December 1998 through March 7, 2002. The earlier claim is not disputed in the present case. Romans alleges that she became disabled on March 9, 2002, due to chronic fatigue syndrome, migraines, angina, fibromyalgia, asthma and shoulder problems.

The ALJ applied the sequential disability determination process set forth in 20 C.F.R. § 404.1520. *See Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). At step four of that process, the ALJ determined that Romans retained the residual functional capacity (RFC) to perform work she had done in the past and was not disabled as defined in the Social Security Act.

## **DISCUSSION**

The court reviews the Commissioner's decision to ensure that proper legal standards were applied and the findings are supported by substantial evidence in the record. 42 U.S.C. § 405(g);

*Batson v. Commissioner of Soc. Sec. Admin.,* 359 F.3d 1190, 1193 (9th Cir. 2004). The claimant bears the burden of proving that she is disabled. *Id.* at 1193-94.

Romans contends the ALJ erred in identifying her severe impairments, assessing her RFC and relying on vocational testimony elicited with hypothetical assumptions that did not accurately reflect her functional limitations.

### I. Severe Impairments

Romans contends the ALJ erred at step two by failing to identify all of her severe impairments, omitting hand and left shoulder pain, chronic fatigue syndrome and irritable bowel syndrome.

At step two of the decision-making sequence, the claimant must show that she has any combination of impairments that significantly limits her ability to perform basic work activities. *Yuckert*, 482 U.S. at 146. It is a *de minimis* screening device to dispose of groundless claims. *Smolen v. Chater,* 80 F.3d 1273, 1290 (9th Cir. 1996). If the claimant does not meet this threshold burden, the Commissioner will find her not disabled without continuing to the remaining steps. 20 C.F.R. § 404.1520(c); Social Security Ruling (SSR) 85-28.

The task at step two is not to identify each individual impairment that would independently satisfy the *de minimis* severity screening. The question is whether any combination of impairments has more than minimal impact on the ability to do basic work activities. Here, the ALJ resolved that question in Romans' favor and properly continued to the remaining steps of the sequential decision-making process.

The ALJ's decision reflects that he considered all the evidence of functional limitations posed by hand and left shoulder pain, chronic fatigue syndrome and irritable bowel syndrome in his

assessment of Romans' RFC. Accordingly, any error in designating specific impairments severe could not have prejudiced Romans at step two and was harmless. *See Burch v. Barnhart*, 400 F.3d 676, 682 (9th Cir. 2005) (Any error in omitting obesity from list of severe impairments at step two harmless where step two was resolved in claimant's favor); *Lewis v. Astrue*, ___ F.3d ___, 2007 WL 2325018 (9th Cir. Aug 16, 2007) (failure to list bursitis as severe at step two harmless error where limitations posed by bursitis considered at step four).

## II. RFC Assessment

Romans contends the ALJ failed to assess her RFC accurately because he discredited her subjective statements and the testimony of her son, rejected the opinion of Mary Pickett, M.D., and failed to comply with SSR 96-8p.

### A. Romans' Credibility

Romans testified that she has daily headaches which leave her unable to function eight days a month; a rotator cuff tear which has resulted in a frozen right shoulder; pain in the left shoulder and hands resulting in difficulty hanging clothes, holding pots and pans and writing; and Pain in her feet and knees causing difficulty squatting and kneeling. She experiences chest pain twice a week and daily cramps and constipation from irritable bowel syndrome.

Romans testified that she has been unable to work full time since receiving a diagnosis of chronic fatigue syndrome (CFS) in 1991. She works 15 hours a week at a fast-food restaurant in shifts of 4 to 7 1/2 hours. When she works a long shift, she must take the next day off to recuperate. If she works more than three days in a row, she gets a fever. She testified that she tries to work as much as physically possible to do what is best for the company.

The ALJ found that Romans had significant limitations but discounted her claim that she is unable to perform any of her past work on a full time basis and her allegations of limitations exceeding the following RFC assessment:

> The claimant has the residual functional capacity to lift 20 pounds occasionally and 10 pounds frequently. She can stand and walk 6 hours out of an 8-hour day and sit 6 hours out of an 8-hour day. She can frequently climb ramps and stairs, stoop, kneel, crouch and crawl. She cannot climb ladders, ropes or scaffolds. She can occasionally balance. She should avoid all exposure to hazards.

Tr. 29.[1]

If a claimant produces objective medical evidence of an underlying impairment that could reasonably be expected to produce the symptoms alleged, the ALJ must assess the credibility of the claimant regarding the severity of those symptoms. *Smolen v. Chater*, 80 F.3d at 1281-82; *Cotton v. Bowen*, 799 F.2d 1403, 1407-08 (9th Cir. 1986).

The ALJ must provide clear and convincing reasons for discrediting a claimant's testimony regarding the severity of her symptoms. *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993); *Smolen v. Chater*, 80 F.3d at 1283. The ALJ must make findings that are "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony." *Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995).

The ALJ may consider objective medical evidence and the claimant's treatment history as well as the claimant's unexplained failure to seek treatment or to follow a prescribed course of treatment. *Smolen*, 80 F.3d at 1284. The ALJ may also consider the claimant's daily activities, work record, and observations of physicians and third parties with personal knowledge about the

---

[1] "Tr." refers to the official transcript of the administrative record.

claimant's functional limitations. *Id*. In addition, the ALJ may employ ordinary techniques of credibility evaluation such as prior inconsistent statements concerning symptoms and statements by the claimant that appear to be less than candid. *Id*. 20 C.F.R. § 404.1529; SSR 96-7p.

The ALJ found that Romans' subjective opinion of her limitations differed significantly from the objective medical findings. He noted that many of her claimed limitations were not supported by the medical record. For example, Romans complained of debilitating hand pain in her testimony and intermittently mentioned hand pain of a lesser degree to medical providers. The medical findings, however, do not include any objective or clinical evidence of functional limitations in the use of the hands.

In 2001, an examination by William Hersh, M.D., revealed no pain, swelling or redness in the joints of the hands. Tr. 1128. Brett Stacey, M.D., could not relate her complaints of hand pain to any diagnosis. Tr. 1121-22. Laboratory tests showed normal rheumatoid factor and ANA. Tr. 1166.

In July 2002, Mary Pickett, M.D., found that Romans had full range of motion in both hands with benign findings except a degree of subjective tenderness in some joints. She required no treatment beyond Tylenol and a topical cream. Tr. 1102. At her annual physical one month later, Romans did not mention hand pain to Dr. Pickett. Tr. 1098, 1100.

In 2004, Joseph Whitson, D.O., found that Romans had good range of motion in the hands, without swelling, nodules or other signs of functional impairment. X-rays were unremarkable without signs of osteoarthritis or rheumatoid arthritis. Tr. 1277, 1307-09. David Thorsett, M.D., obtained benign results in his examination of Romans' hands. He noted the absence of muscle atrophy, negative Tinel's and Phalen's signs, a negative grind test and only mild discomfort to

palpation. Sensation and motor function were grossly intact and symmetrical. X-rays of the left wrist were normal. Tr. 1295. An examination of the hands in January 2006 revealed no limitations in range of motion or other indication of functional limitation. Tr. 1367.

Similarly, the objective medical findings did not fully support Romans' asserted loss of function in the shoulders. Romans was evaluated for left shoulder pain in August 2004, but Dr. Thorsett did not indicate any functional limitations. Romans had full active and passive range of motion in the left shoulder without weakness on strength testing. Tr. 1287-88. X-ray and ultrasound studies showed a completely normal left shoulder with normal tendons in the shoulder and biceps. Tr. 1284, 1293, 1294. In July 2005, Romans had a benign physical examination of the left shoulder. Tr. 1352-53.

Her right shoulder was more problematic. An MRI study in May 2003 showed a rotator cuff tear in the right shoulder. Tr. 1096-97. The soft tissues and osseous structures appeared normal, however, in radiology studies from December 2003. Tr. 1329, 1330. Dr. Thorsett's physical examination in January 2004 showed no atrophy or asymmetry of the shoulder musculature. Romans had some limitations in abduction and rotation ranges of motion, but not the complete immobility implied by her testimony. Dr. Thorsett felt Romans could improve her motion with a diligent home exercise program. Tr. 1187-88.

In April 2004, John French M.D., found that Romans had limited active range of motion in the right shoulder. Romans admitted she had not complied with the home exercise program recommended by Dr. Thorsett. Dr. French noted that pain medication improved her functional capacities. Tr. 1282.

In November 2004 Dr. Thorsett indicated that Romans' subjective description of hand, wrist and shoulder discomfort would be consistent with bursitis or tendinitis, but did not make objective or clinical findings. He declined to offer an opinion regarding functional limitations or restrictions on work-related activities. Tr. 1280.

The objective medical evidence did not support limitations in the feet or knees. In January 2002 Romans complained of left knee pain, at her initial visit with Dr. Pickett. Tr. 1108. The medical records do not support ongoing problems thereafter. Romans complained of new bilateral foot pain in June 2004. Tr. 1307. X-rays were negative for signs of osteoarthritis or other abnormalities. Tr. 1327. She did not raise this issue again with medical providers.

Romans sought treatment for atypical chest discomfort in 2002. She had a normal physical examination but produced an abnormal electrocardiagram study on a treadmill stress test. Follow up serial cardiac enzyme studies were negative and a cardiac catheterization/angiogram procedure showed absolutely normal coronary arteries and ventricular function. Tr. 1063-72.

Dr. Pickett suggested Romans' chest pain was a side effect of excessive use of Imitrex, a pain medication with significant vasoconstrictor properties. Tr. 1101. In July 2002, Romans complained of chest discomfort, but all objective signs including a physical examination, radiology study, urinalysis and blood lab work were normal. Tr. 1054-61, 1098. In December 2002, a chest radiology study showed her heart within normal limits and no sign of pulmonary disease. Tr. 1331.

In March 2005, Romans had an examination to follow up on her 2002 episode of chest pain. Her electrocardiogram result was similar to the 2002 results. The cardiologist opined that it was highly unlikely that Romans had coronary artery disease, given her history of benign evaluations. Tr. 1351. Romans wore a heart monitor for two months and obtained benign results. Tr. 1350.

Similarly the medical records do not include clinical or objective findings that would support a diagnosis of irritable bowel syndrome. The records do not reflect that Romans ever sought treatment or complained to medical providers of symptoms associated with irritable bowel syndrome during the relevant period of time. At most, the records reflect that Romans claimed to have this diagnosis in the distant past. This is inconsistent with Romans' testimony that she suffers from bowel problems on an almost daily basis.

The ALJ acknowledged that Romans had a distant history of CFS. In February 1991 Romans complained of fatigue and exercise intolerance. The case record does not include medical findings establishing the diagnostic criteria for CFS. Despite this, Romans received a CFS diagnosis in 1991 with a recommendation for further evaluation when appropriate testing became clinically available. Tr. 303-04.

Thereafter, Romans reported having a history of CFS to health care providers, including Dr. Hersh in 1997 and Dr. Stacey in June 2001. Tr. 287, 1121-23. The record does not reflect clinical findings supporting the diagnostic criteria for CFS at these times and Romans did not seek treatment for the fatigue and exercise intolerance that gave rise to the 1991 diagnosis. Instead, Romans complained primarily of chronic headaches and various orthopedic problems.

Romans reported her history of CFS to Dr. Pickett at the alleged onset of disability in March 2002. Dr. Pickett was unable to confirm the diagnostic criteria for CFS, noting only that Romans appeared to have fit the criteria in the past. Tr. 1103-04. There is no mention of CFS in the progress notes from Romans' annual physical examination in August 2002. Tr. 1100. Later medical records reflect that Romans often reported having been diagnosed with CFS in the past without complaining of current symptoms. Tr. 1181-85, 1280, 1296, 1351.

In summary, Romans did not present objective medical evidence supporting functional limitations in the hands, left shoulder, feet, knees, heart or lungs. She did not present evidence of a current ongoing chronic fatigue syndrome or irritable bowel syndrome. The evidence supports some loss in range of motion of the right shoulder that she could have improved by following Dr. Thorsett's recommendations. It does not support the degree of immobility Romans alleged.

Romans complained of chronic daily headaches in June 2001 at a pain management clinic. Dr. Stacey diagnosed transformed migraine, a condition in which episodic severe migraines are replaced by frequent mild to moderate headaches. Romans reported 80 to 90% relief from Imitrex. Tr. 1121-25. In December 2001, Romans reported that she had reached a good level of pain control with Imitrex. Tr. 1109-14.

Later Romans' physicians became concerned about her overuse and dependence on Imitrex. When Dr. Pickett became Romans' primary care physician in 2002, she felt Romans was addicted to Imitrex. She believed Romans' chronic daily headaches were rebound symptoms and that Romans' noncardiac/nonpulmonary chest pain was a side effect of excessive Imitrex. Tr. 1100-01.

In April 2004, Dr. Whitson also opined that Romans was experiencing narcotic induced headaches as opposed to migraines, but Romans continued to resist a reduction in pain medications. Tr. 1309-10. In January 2005, she changed providers rather than accept a reduction in prescription narcotics. Tr. 1296. In 2005, a neurologist opined that any evaluation of Romans' headaches was compromised by her chronic use of narcotic pain medications. Tr. 1335.

The ALJ could reasonably conclude from Romans' reports to medical providers that her migraines were well controlled by Imitrex by 2001. He could conclude that her ongoing rebound headaches result from an unwillingness to follow medical recommendations to reduce her excessive

use of Imitrex. The ALJ could also find that the medical evaluations regarding functional impairment from headaches were compromised by Romans' excessive use of narcotic pain medications and unwillingness to follow recommendations to reduce her use of them. This interpretation of the objective medical evidence is reasonable and does not support Romans' allegation that she is entirely incapacitated by migraines several days each month.

The ALJ also considered Romans' daily activities. He found her ability to work a regular schedule inconsistent with the claim that she is incapacitated some days by shoulder impairments, headaches or fatigue. He found her ability to work part time, look after her grandson after work, participate in religious meetings five or more hours per week, run errands after work and perform typical household chores inconsistent with her claim that fatigue would prevent her from working on consecutive days. While her activities are not equivalent to full time work, they require light exertion over a period that exceeds her part time work schedule and reasonably supports the ALJ's conclusion that she is not as restricted as described in her testimony.

The ALJ also pointed out that some of Romans' statements appeared to be less than candid. She testified that she was limited to 15 hours of work by health conditions. She said she tried to work as much as her condition permitted for the good of her employer. In fact, she limits her hours at work to ensure that her earnings do not exceed the limits for the Oregon Health Plan and housing assistance benefits. She arranges her work schedule so that she can help her son with childcare.

The ALJ considered proper factors and his credibility determination is supported by substantial evidence in the record as a whole, including the objective and clinical medical evidence from Romans' treatment history, her reported daily activities and her prior statements. These factors

permitted the ALJ to draw an adverse inference regarding the credibility of Romans' subjective opinion of her limitations. *Smolen*, 80 F.3d at 1284.

The ALJ's interpretation of the evidence is reasonable and provides an adequate basis for discounting Romans' allegations of combined functional limitations in the hands, shoulders, knees, feet, chest, bowel and from CFS that are so severe that she cannot perform any of her past work at a level equivalent to substantial gainful activity. The ALJ's findings are sufficiently specific to permit this court to conclude that he did not discredit Romans' testimony arbitrarily. *Orteza v. Shalala*, 50 F.3d at 750.

### B. Lay Witness

Romans' son Nathan Roder testified that Romans can walk about two blocks before resting, has difficulty with her hands, has one shoulder that locks up and complains of headaches about one out of four days. She arranges her schedule at work so it does not conflict with the days she watches his 12-year old son.

Roder testified that Romans seems to get worn out easily. If she works a 5-hour shift, she goes to bed as soon as she gets home. If she works two consecutive days, she spends the following day in bed. Pain in the hands and shoulders makes her hesitate when she performs tasks and fatigue makes her rest before completing tasks, contributing to a slow pace of activity. He estimated that Romans could do her fast food work at about 80% of normal pace for up to 5 hours. Longer hours or heavier work reduce her pace to about 40 to 50% of normal.

Friends and family members and others in a position to observe a claimant's symptoms and daily activities are competent to testify as to the claimant's condition. *Dodrill v. Shalala,* 12 F.3d at 918. Such testimony cannot be disregarded without comment. *Nguyen v. Chater*, 100 F.3d 1462,

1467 (9th Cir. 1996). If the ALJ wishes to discount lay witness testimony, he must give reasons that are germane to the witness. *Id.*

The ALJ did not disregard Roder's testimony without comment. He found Roder's allegations not entirely credible in light of Romans' reported activities. He found Romans' ability to work shifts of greater than 7 hours inconsistent with Roder's assertions that she must go to bed after a 5-hour shift, cannot walk more than two blocks and has difficulty using her hands and shoulders. He found Romans' ability to run errands after work, participate in religious meetings several times a week and care for Roder's son inconsistent with Roder's assertion that she requires excessive rest after 5 hours or work or after working on consecutive days.

The ALJ noted that Roder was not entirely candid when he testified that Romans was typically asleep when he arrived after work. Under further questioning, Roder admitted that he worked a graveyard shift and arrived at 6:00 a.m. The ALJ reasonably found that this and the record as a whole did not support the allegation that Romans' requires excessive rest.

Based on the foregoing, the ALJ provided an adequate basis for discounting Roder's testimony. The ALJ's factual findings must be upheld if supported by inferences reasonably drawn from the record, and if evidence exists to support more than one rational interpretation, the court must defer to the Commissioner's decision. *Andrews v. Shalala*, 53 F.3d 1035, 1039-40 (9th Cir. 1995). Here, the ALJ's interpretation of the evidence is reasonable and cannot be disturbed.

### C. Medical Source Statements

Romans contends the ALJ improperly rejected the medical opinion of Dr. Pickett, her primary care physician. Romans transferred her primary care to Dr. Pickett on February 5, 2002.

At that time Romans reported a history of disability due to chronic fatigue syndrome "with difficulty completing greater than 5 hours of work in a 48 hour stretch." Tr. 1105.

On March 1, 2002, Romans told Dr. Pickett that she needed confirmation of her CFS diagnosis for purposes of her legal advocacy in support of her Social Security claim. Dr. Pickett was unable to confirm the diagnosis. Romans did not complain about current CFS symptoms and was concerned primarily with headaches.. Tr. 1103-04. When Dr. Pickett next saw Romans, on July 2, 2002, Romans did not mention either fatigue or headaches. Tr. 1102.

On July 23, 2002, Dr. Pickett discussed migraine prophylaxis with Romans to decrease her dependence on Imitrex, which Romans had been taking every 8 hours for 4 years. Romans related a remarkable history of intolerance to numerous prophylactic agents tried in the past. Again, Romans did not report current fatigue. Tr. 1101.

On August 27, 2002, Romans reported that she had been unable to tolerate metoprolol or Neurontin for migraine prophylaxis. Dr. Pickett advised Romans that she was probably addicted to Imitrex and having rebound headaches. She noted that Romans had a history of prescription narcotic addiction intolerance which required detoxification. Notably, Romans did not report current ongoing fatigue, stating only that one of the prophylactic agents caused her to feel fatigue. Tr. 1098, 1100.

On January 28, 2003, Romans complained of mild to moderate symptoms reminiscent of the chronic fatigue symptoms she experienced in 1990. This is the first such recurrence during the period that is relevant for this claim. Romans associated this with stressors including her mother's cancer diagnosis, a reduction in her work hours and the denial of her Social Security claim. Tr. 579.

On January 30, 2003, Dr. Pickett completed a worksheet questionnaire for the Oregon Employment Department. She indicated that Romans had disabling migraine headaches and chronic

fatigue. Dr. Pickett stated that Romans had been unable to work more than 5 hours in a 2-day period since 1991. She said Romans' ability to work was restricted to 18 hours per week. Tr. 1099. Romans argues that the ALJ improperly rejected this worksheet.

An ALJ can reject a treating physician's opinion in favor of the conflicting opinion of another physician, if the ALJ makes "findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record." *Thomas v. Barnhart*, 278 F.3d 947, 956-57 (9th Cir. 2002) quoting *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989). If the treating physician's opinion is not contradicted by another physician, then the ALJ may reject it only for clear and convincing reasons. *Id.*

Here the ALJ provided adequate reasoning under either standard. He pointed out that Dr. Pickett's opinion was a fill-in-the-blank worksheet with conclusions that were not supported by Dr. Pickett's own medical findings or the record as a whole. Dr. Pickett's treatment notes reveal that she was unable to diagnose CFS and believed that Romans' headaches were rebound headaches from excessive use of Imitrex instead of migraines. Accordingly, her opinion that Romans suffers from disabling migraines and chronic fatigue is conclusory and unsupported by clinical findings. An ALJ may properly reject a physician's opinion that is conclusory and unsupported by clinical findings. *Meanal v. Apfel*, 172 F.3d 1111, 1117 (9th Cir. 1999).

The ALJ also found Dr. Pickett's opinion inconsistent with other evidence of record, including Romans' activities and intent to limit her working hours for non-disability purposes. Dr. Pickett's opinion that Romans' had been unable to work more than 5 hours in a two day period since 1991 leaves unexplained the undisputed period of non-disability from December 1998 to March

2002. The ALJ could reasonably expect the medical records to show some evidence of a deteriorating condition to explain this and they do not.

Romans argues that her activities do not negate Dr. Pickett's worksheet because sporadic, short-lived activities and occasional symptom-free periods are not inconsistent with disability. But this argument does not fit the facts of this case. Romans works a regular schedule which, although part-time, is neither sporadic nor short-lived. There is no evidence that she frequently misses work when unexpectedly incapacitated by migraines or CFS symptoms.

An ALJ is also entitled to reject a treating physician's opinion that is premised primarily on subjective complaints that the ALJ properly finds unreliable. *Fair v. Bowen*, 885 F.2d 597, 605 (9th Cir. 1989); *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001). Dr. Pickett's worksheet appears to be a word-for-word reiteration of Romans' subjective report from February 2002 when she told Dr. Pickett she had been disabled by CFS since 1991 with difficulty working more than 5 hours in a 48 hour stretch. Tr. 1105. Because the ALJ properly found Romans' subjective reports unreliable, he was entitled to reject Dr. Pickett's opinion premised primarily on this statement.

### D. SSR 96-8p

Romans argues that the ALJ did not comply with SSR 96-8p because he failed to discuss whether she is capable of working on a regular and sustained basis and failed to consider all of her impairments.

Romans argues that the ALJ failed to assess whether she can work on a regular and continuing basis. The burden is on the plaintiff to produce evidence that she cannot work. *Roberts v. Shalala*, 66 F.3d at 182. If she asserts that she cannot work on a sustained basis, she must produce evidence from which this can be established. For example, she could show that her condition waxes

and wanes, deteriorates during the workday or some other basis from which it can reasonably be inferred that she can work some times but not others.

Romans did not produce credible evidence of such an impairment. Indeed, the record reflects that she is currently working on a regular and sustained basis, albeit part-time. The ALJ considered all the evidence Romans produced and in doing so considered all the evidence of her ability to work on a regular and sustained basis.

Romans argues that the ALJ failed to consider all of her impairments in assessing her RFC. The ALJ considered all the evidence presented with respect to Romans' impairments and reached reasonable conclusions based on that evidence, with one exception. It appears the ALJ neglected to determine the functional limitations associated with Romans' right shoulder impairment.

An MRI report in May 2003 showed that Romans had a torn rotator cuff and tendinitis in the right shoulder. Tr. 1096-97. In January 2004, Dr. Thorsett found that Romans had limited range of motion in the right shoulder. Tr. 1187-88, 1280, 1288. In April 2004, Dr. French found marked limitation in range of motion in the right shoulder. Tr. 1281-82.

Based on these findings, the ALJ concluded that Romans' right shoulder impairment contributed to limitations in Romans' ability to perform work-related activities. Tr. 29. Unfortunately, it is not clear from the ALJ's otherwise well-crafted decision, that his RFC assessment reflected the functional limitations caused by Romans' right shoulder impairment. Accordingly, the ALJ must reconsider his assessment of Romans' RFC, ensure that it accurately reflects all of Romans' functional limitations and explain how he accounts for Romans' shoulder impairment.

### III. Step Four Determination

Romans challenges the ALJ's conclusion that she can perform her past work on three grounds. First, she contends the ALJ relied on an erroneous assessment of her RFC that did not accurately reflect all of her functional limitations. The court is unable to discern from the ALJ's decision whether the RFC assessment accurately reflects Romans' functional limitations from the impairment of her right shoulder. To that limited extent, the court accepts Romans' argument.

Second, Romans contends the ALJ failed to investigate the demands of her past work and compare them to her RFC assessment as required by 20 C.F.R. § 404.1520(e) and SSR 82-62. For example, Romans argues that she has reaching limitations from her shoulder impairment that would make her unable to perform her past work. In proceedings after remand the Commissioner must ensure that these regulatory requirements are met.

Third, Romans contends her past work did not meet the regulatory definition of "past relevant work," which includes only work done within the last 15 years, for a period long enough to learn the job and at a level consistent with substantial gainful activity. 20 C.F.R. § 404.1565(a). Because this case must be remanded for the reasons stated above, the court need not resolve that issue at this juncture.

## CONCLUSION

The ALJ did not accurately assess Romans' residual functional capacity. His conclusion that Romans can return to her past work cannot be sustained. The present record does not establish that Romans was disabled during the relevant period. Further proceedings are appropriate to correct the errors in the Commissioner's decision.

The Commissioner's decision is REVERSED and REMANDED pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this Opinion and Order.

IT IS SO ORDERED.

DATED this  13  day of October 2007.

                                             /s/ Ann Aiken  
                                                   Ann Aiken  
                                         United States District Judge